## Case No. 5,676.

### GRAHAM v. STARK et al.

[3 Ben. 520;[1] 3 N. B. R. 357 (Quarto, 93); 2 Chi. Leg. News, 73.]

District Court, N. D. New York. Nov., 1869.

FRAUDULENT PREFERENCE — MORTGAGE—AGENT— INSOLVENCY.

1. A debtor, who is unable to meet his engagements and pay his debts in the ordinary course of business, as persons in trade usually do, is insolvent within the meaning of the bankruptcy act.

[Cited in Re Bininger, Case No. 1,420.]

2. When a creditor accepts a security for his debt, he is conclusively presumed to know what appears upon its face, and to have reasonable

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

·cause to believe it was intended to accomplish what must be its ordinary and necessary effect.

[Cited in Singer v. Sloan, Case No. 12,899.]

3. Securities given for the purpose of giving a preference, are none the less void under the bankruptcy act [of 1867 (14 Stat. 517)] because they were given in pursuance of a previous promise, made when the debt was contracted, to give security for it.

[Cited in Hubbard v. Allaire Works, Case No. 6,814; Ex parte Ames, Id. 323; Hall v. Wager, Id. 5,951; Goodenow v. Milliken, Id. 5,535; Re Montgomery, Id. 9,732; Re Jackson Iron Manuf'g Co., Id. 7,153; Lloyd v. Strobridge, Id. 8,435.]

[Cited in Cook v. Whipple, 55 N. Y. 156; Sartwell v. North, 144 Mass. 194, 10 N. E. 827.]

4. Where a married woman, engaged in business, gave the management of her affairs to her husband, and was afterwards adjudged bankrupt: *Held*, that his acts, knowledge and intentions in reference to the business must be held to be her acts, knowledge .and intentions.

[Cited in Re Goodman, Case No. 5,540.]

5. Where a mortgage was given by such bankrupt to secure a debt, but without the creditor's urging its execution or asking for security, but the mortgage covered the whole of the bankrupt's personal property, and was not given in the ordinary course of business, and other mortgages to another creditor were executed at the same time: *Held*, that this mortgage was fraudulent and void under the bankruptcy act.

[Cited in Martin v. Toof, Case No. 9,167; Walbrun v. Babbitt, 16 Wall. (83 U. S.) 581.]

[See Babbitt v. Walbrun, Case ·No. 695.]

6. The other mortgages, which were on the stock and real estate, and were taken at a time and in a form which must necessarily break up the bankrupt's business, to secure a debt which had been overdue for a year and a half, were also fraudulent and void.

[Suit in ·equity by Lewis B. Graham, assignee of Caroline A. Martin, a bankrupt, against Oliver Stark and Elizabeth B. Savage.]

Charles G. Judd, for assignee.
D. Morris, for Stark.
D. B. Prosser, for Mrs. Savage.

HALL, District Judge. This is a proceeding by the assignee of Mrs. Martin, to set aside certain mortgages, executed by her prior to the filing of the petition on which she was adjudged a bankrupt. The creditor's petition, on which such adjudication was made, was filed on the 5th day of November, 1868; and she was adjudged a bankrupt on the 2d day of February, 1869.

Mrs. Martin, a married woman, had, by her husband, De Lancey Martin, as her general agent, carried on the business of buying and selling hats, furs, gloves and furnishing goods, in her own name, and, professedly at least, on her separate account, for some years prior to May 28th, 1868. Her husband, in the conduct and management of this business, acted according to his own discretion, without any active interference or controlling supervision of the bankrupt. Indeed, the husband testified that the business was left wholly to him; that she knew nothing about the state of affairs in the store, except what he communicated to her; and she testified that he had the sole charge of the business.

The stock kept on hand was generally worth from $10,000 to $15,000, and the annual sales were ordinarily from $15,000 to $20,000. In the course of this business Mrs. Martin contracted debts from time to time; and, on the 28th of May, 1868, such debts, including those secured on real estate, exceeded $10,500, and De Lancey Martin testified that such debts might have been nearly $12,000. At that time the stock of goods on hand was probably worth about $7,000, and she had a few dollars in cash, and notes and accounts worth in all about $1,500. She had, besides, a house ·and lot in Penn Yan, worth from $3,000 to $3,500, on which were two mortgages amounting to $1,600 or $1,700, both of which were overdue. Among her debts, owing to more ·than twenty different parties, (the larger ·portion of. which debts was overdue,) was :the debt due to the respondent, Elizabeth B. Savage, of $4,804.27, for money borrowed in 1865, and in the spring of 1866. It was borrowed to· pay debts in New York, and was used for that purpose.

There was also among such debts a·debt of $1,111.63 to the respondent, Oliver Stark; $1,000 of which· was owing upon a note which he had discounted for her, and on which one Bridgen, a brother-in-law of the bankrupt, was an accommodation. endorser, and which note was to become due June 22d, 1868. The original discount had been made two or three years before; and it had been renewed, from time to time, on notes payable in sixty days or three months, until the then existing note was given about the 20th day of March, 1868. The remaining $111.63 was for an overdraft by the bankrupt, which had occurred about a month before.

On or about the 28th day of May, 1868, the bankrupt gave her promissory note of that date to the respondent, Savage, for $4,804.27, payable one day after that date; and, at the same time, executed to her a chattel. mortgage of that date, upon the bankrupt's whole stock of goods, conditioned for the payment of $4,804.27, according ·to the· terms· of such note.

In addition to this chattel mortgage, .the bankrupt also executed a mortgage upon her house and lot, to secure $1,000 of such debt, payable one day after date, as collateral security to said chattel mortgage. This mortgage, though executed at the same time with the chattel mortgage, was dated on the 30th day of May, 1868. At the same time the bankrupt executed to the respondent, Stark, another chattel mortgage, on the whole of her stock of goods, to secure to him the payment of $111.63, one day after date, and the

payment of the above mentioned note of $1,000, on which the brother-in-law of the bankrupt was an accommodation endorser.

After the execution of these instruments, and about the 2d of June, 1868, the bankrupt went to the Western states, and remained absent from this state until the 15th of October of that year, and until after an attachment had been levied upon her property at Penn Yan. A day or two before her return, she executed a deed in fee of her house and lot at Penn Yan, to one Blackman, without consideration paid at the time. Blackman had, however, sent her small sums of money for her expenses, at three or four different times, while she was absent from the state, but the amount he had so sent does not appear.

After the execution of the mortgages to the respondents, De Lancey Martin, as the agent of the bankrupt, continued in the possession of the stock of goods mortgaged, with the knowledge and assent of the mortgagees; and he continued to sell the goods mortgaged, at retail, as usual, until the 6th of October, 1868. He also bought new goods, defrayed current expenses, including payments for his own board, paid small debts to various persons, and kept the books of the establishment, and otherwise carried on the business of the bankrupt, the same as before the mortgages were given.

On the 6th of October, the respondents took possession of the goods mortgaged and turned De Lancey Martin, the bankrupt's husband and agent, out of the store. They then, by their own agent, continued the business and sold at retail, for three months, or thereabouts; and then sold the remainder of the goods to De Lancey Martin for $1,000; and four notes of $250 each, payable at 4, 6, 8, and 10 months, were given for the price of such goods.

The change of possession on the 6th of October, was made in the morning of that day; just before an attachment, which had been issued against the bankrupt, was levied on such of the notes and accounts, which had belonged to her, as yet remained on hand.

For some years prior to May, 1868, Mrs. Savage, the respondent, had lived in the bankrupt's house as her tenant; and Mr. and Mrs. Martin had boarded with Mrs. Savage—the amount charged for board and for rent being nearly equal. Mrs. Savage continued to occupy the house, and Mr. Martin continued to board with her, until after possession was taken under the chattel mortgages on the 6th of October, 1868. In July, 1868, Mrs. Savage purchased a mortgage of $600, and interest on Mrs. Martin's house and lot; and in November she purchased the other mortgage on the same, of $1,000, and interest. Both these purchases were made with the proceeds of the sales of the property mortgaged to her by the bankrupt on the 28th of May, 1868. In

March, 1869, Mrs. Savage commenced an action to foreclose these mortgages, and the $1,000 mortgage executed to her as before stated; but her proceedings in that action were stayed by injunction.

It appears from the testimony of De Lancey Martin, that when the money was borrowed from Mrs. Savage, and when Mr. Bridgen endorsed the $1,000 note, it was agreed that they should be secured; that Mrs. Savage had asked for security for her debt one or two months before the bankrupt went west, and that she spoke about it, and asked for such security several times before it was given,—urging that she wanted the bankrupt to give her security before she went away.

Bridgen had also frequently urged that the $1,000 note should be paid; and he had asked in the spring of the same year that security should be given in case it was not soon paid.

Having thus given the more prominent and undisputed facts of the case, the controverted questions of fact and law will now be discussed; and in doing this, further reference to the evidence bearing upon these questions of fact will necessarily be made.

Upon the question of the actual and hopeless insolvency of the bankrupt, at the time the mortgages to the respondents were given, there can be no well founded doubt. The apparent denials of the knowledge of this insolvency on the part of the bankrupt and her husband, must, in charity, be ascribed, so far as the husband is concerned, to a misapprehension of the legal definition of that term, as used in the bankruptcy act—a misapprehension quite likely to arise from the not uncommon misunderstanding of that term; and, so far as the bankrupt is concerned, to a similar misapprehension, or to the fact that her actual financial condition had been carefully concealed from her by her husband. There is no pretence that she had met with any considerable loss or that her pecuniary circumstances had materially changed between the 28th of May, 1868, and the time the respondents took possession of her stock of goods on the 6th of October thereafter, and upon the whole evidence it is entirely certain that Mrs. Martin was then wholly unable to meet her engagements and pay her debts in the ordinary course of business as persons in trade usually do;—and she was therefore insolvent within the meaning of the bankruptcy act. 2 Kent, Comm. 389; Thompson v. Thompson, 4 Cush. 127; Lee v. Kilburn, 3 Gray, 594; Spratt v. Hobhouse, 4 Bing. 173; Buckingham v. McLean, 13 How. [54 U. S.] 150; Merchants' National Bank v. Truax [Case No. 9,451]; In re Black [Id. 1,457]; In re Gay [Id. 5,279]; In re Louis [Id. 8,527]; Morgan v. Mastick [Id. 9,803].

That De Lancey Martin, the agent of the bankrupt, and who had the entire management and control of her business, well knew

that she could not meet her engagements, as persons in trade ordinarily do, is entirely clear; indeed he must have known that there was no probability that she would be able to continue her business and pay her debts in full; and, when the chattel mortgages were given upon her whole stock in trade to secure nearly $5,000, payable in three or four days thereafter, and $1,000 more in less than thirty days, he must have contemplated the entire breaking up of the bankrupt's business, as a thing of course, whenever the pressure of other creditors who had no security—several of whose debts were then past due—should induce the mortgagees, for their own security, to take possession of the property mortgaged.

And he must also have foreseen that the fact, that Mrs. Martin had thus incumbered her whole property, by these mortgages, would cause her unsecured creditors to endeavor to procure payment of their debts, or force Mrs. Martin into bankruptcy, very soon after they obtained a knowledge of the existence of such mortgages.

In the directions for and in the preparation of these mortgages—indeed in everything except the mere formal execution of the mortgages—De Lancey Martin acted for the bankrupt; and his acts, his knowledge and intentions, for the purposes of this case, are, in law, the acts, knowledge and intentions of his principal, the bankrupt. Story, Ag. §§ 140, 140d, 451.

That he, as such agent, intended that these mortgages should secure the payment of the debts of the respondents in preference to the debts of other creditors; and that he procured their preparation and execution in contemplation of the bankrupt's insolvency, is beyond question; and it hardly can be doubted that he then contemplated the subsequent bankruptcy of Mrs. Martin, and actually intended (as the law under such circumstances presumes he intended), to defeat the ordinary operation and effect of the bankrupt law. which secures a pro rata division of a bankrupt's property to and among his or her creditors. In short, in view of the special provisions of the bankruptcy act presently to be noticed, and of its general policy and provisions, as well as of the rule of law that every one must be presumed to intend the natural and usual consequences of his voluntary acts, it must be considered as entirely certain that the execution of the three mortgages to the respondents were acts of bankruptcy and fraud, so far as the bankrupt herself is concerned, and contrary to the provisions of the bankruptcy act.

The 29th section of the bankruptcy act provides, among other things, that no discharge shall be granted to a bankrupt if he has given any fraudulent preference contrary to the provisions of that act, or made any fraudulent payment, gift, transfer, conveyance or assignment of any part of his estate; or if he has in contemplation of becoming a bankrupt made any pledge, transfer, assignment or conveyance of any part of his property, directly or indirectly, absolutely or conditionally, for the purpose of preferring any creditor or person having a claim against him, or who is or may be under any liability for him, or for the purpose of preventing the property from coming into the hands of the assignee, or of being distributed under the act in satisfaction of his debts; or if he has been guilty of any fraud whatever contrary to the true intent of the act.

The thirty-fifth section provides, among other things, that if any person, being insolvent, or in contemplation of insolvency or bankruptcy, within six months before the filing of the petition by or against him, makes any payment, sale, assignment, transfer, conveyance or other disposition of any part of his property to any person who then has reasonable cause to believe him to be insolvent, or to be acting in contemplation of insolvency, and that such payment, sale, assignment, transfer, or other conveyance is made with a view to prevent his property from coming to his assignee in bankruptcy, or to prevent the same from being distributed under this act, or to defeat the object, or in any way impair, hinder, impede or delay the operation and effect of, or to evade any of the provisions of this act, the sale, assignment, transfer or conveyance, shall be void; and the assignee may recover the property or the value thereof as assets of the bankrupt; and that if such sale, assignment, transfer or conveyance is not made in the usual and ordinary course of business of the debtor, the fact shall be prima facie evidence of fraud.

The thirty-ninth section provides in substance, among other things, that it shall be an act of bankruptcy if any one, being bankrupt or insolvent, or in contemplation of bankruptcy or insolvency, shall make any payment, sale, conveyance or transfer of money or other property, rights or credits, with intent to give a preference to one or more of his creditors, or with the intent. by such disposition of his property, to defeat or delay the operation of the bankruptcy act; and that if such person shall be adjudged a bankrupt, the assignee may recover back the money or other property so paid, conveyed, sold, assigned or transferred contrary to that act; provided the person receiving such payment or conveyance had reasonable cause to believe that a fraud on this act was intended, and that the debtor was insolvent; and such creditor shall not be allowed to prove his debt in bankruptcy.

Having already determined that the securities given by the bankrupt must be considered as fraudulent and void under the provisions of the bankruptcy act, provided the parties accepting the same had reasonable cause to believe Mrs. Martin was insolvent, and that a fraudulent preference or other fraud on the bankruptcy act was intended, or that it was intended thereby to defeat

the object of or evade any of the provisions of the bankruptcy act, it becomes necessary to decide whether the respondents had such reasonable cause to believe at the time they took these mortgages; and the question of the existence of this reasonable cause is the most serious and important of those litigated in the present case.

It must be observed that the question is not as to the actual belief of the creditors, but whether they had reasonable cause for the belief specified in the statute; such reasonable cause as would induce the belief in the mind. of an intelligent, capable business man.

In respect to Mrs. Savage, there is abundant proof of such reasonable cause. She had, as she herself testified, loaned to the bankrupt, in the fall of 1865, a part of the sum for which the mortgages to her were given, and the greater part in the spring of 1866; taking care to provide that she should have security whenever she required it. Although she could not remember when that loaned in 1865 was agreed to be paid, she testified that it was all to be paid in the fall of 1866, or the early part of the succeeding winter, or before. The evidence shows that no part of it was paid when due, or afterwards, prior to the execution of these mortgages; and the whole had been overdue, without any actual extension of the time of payment, for some eighteen months before the mortgages were given. She understood that payment was not made, because the bankrupt had not the money necessary to make the payment. She frequently asked for payment or security, and, in the spring of 1868, a month or two before the mortgages were given, and after she had learned that the bankrupt was going west, on a visit, she not only asked for, but insisted upon, having security. She took a mortgage upon the whole of the bankrupt's stock of goods, being all the personal property she had, except some $1,500 worth of accounts, &c.; and another upon all her real estate, for as much as such real estate would be likely to sell for, subject to incumbrances, at a forced sale; and the amount secured was, by the terms of these mortgages, to be paid in less than five days afterwards. She lived in the same house with the bankrupt, and was frequently in the bankrupt's store, and, doubtless, saw that the stock on hand was light; and she, or the person who acted for her, knew of the Stark mortgage; and she not only took the mortgage on the stock, but also required one on the real estate also, as further security.

She did this, knowing that the bankrupt had not made any payments upon her debt during the year and a half it had remained overdue, and having good reason to believe that she had not been able to make any considerable reduction in the amount of her debt during that period; and she took these securities on such time, and in such form,

as must necessarily break up the bankrupt's business; and must, if her mortgages were valid, give her a secured preference, to the almost entire exclusion of all the bankrupt's creditors, except herself and Stark and those who had their debts secured on the bankrupt's real estate.

The natural, and, indeed, the inevitable effect of thus encumbering the bankrupt's whole property, for the security of the debts of two favored creditors, under the circumstances already stated, was to give such creditors a fraudulent preference; and the creditors were bound to presume, as the law presumes, that the bankrupt intended the natural consequences and effect of her acts.

The facts already stated must be held sufficient to show that Mrs. Savage had reasonable cause to believe that these mortgages were executed with intentions, and under circumstances and conditions, which rendered them fraudulent and void under the bankruptcy act, without aid from the provision of the statute which makes them prima facie void, because not made and executed in the ordinary course of business. This prima facie evidence was alone sufficient to put the party on inquiry, and, taken with the other facts before referred to, must be held conclusive against the validity of these securities. See Haughey v. Albin [Case No. 6,222]; Foster v. Hackley [Id. 4,971]; Grow v. Ballard [Id. 5,- 848]; In re McDonough [Id. 8,775]; Ahl v. Thomer [Id. 103].

If De Lancey Martin must not be considered as having acted as the agent of Mrs. Savage and the respondent Stark, as well as of the bankrupt, in the giving and receiving of the mortgages in controversy, (which is a question not free from doubt,) there is, perhaps, more difficulty in regard to the mortgage executed to the respondent Stark.

In the case of Stark, the mortgage was given without his urging its execution, or even asking for security; and, as he testifies, and all the evidence shows. it was given mainly for the benefit of the brother-in-law of the bankrupt, who was liable, as endorser. for nearly the whole of Stark's debt; and this brother-in-law, it is shown, had been urgent in endeavoring to procure security against his endorsement.

Stark was a banker, and had, for some years, received from time to time a note of the bankrupt, for $1,000. in renewal of a note, of the same amount. previously discounted by him, properly taking care to have its ultimate payment secured by the endorsement of the brother-in-law, Bridgen, who was considered responsible. The bankrupt kept her bank account with Stark, and that account had been overdrawn, for a short time, to the extent of $111, and upwards. Demands against the bankrupt had been sent to Stark's bank for collection, and some had been returned unpaid. The mortgage was executed to him, and. apparently, for his security; but, regarding himself as entirely secure, by reason of

Bridgen's endorsement, he seems to have given the matter but little thought. He, however, testifies, that he supposed the real object in giving the mortgage was to benefit Mr. Bridgen, as he (Stark) had no fears about his debt; that he supposed he authorized Mr. Brown, who drew the mortgage, to draw it; and that he gave him the amount of his account. He swears he did not, at that time, know that Martin was giving security to Mrs. Savage; but Brown, who acted for him, and took the particular security, under such general authority or instruction as he had given him, knew it was to be, or had been given. He also testifies, that he made no inquiry of Mr. Martin, in respect to the state of the bankrupt's affairs; and that he understood the mortgage was taken for the benefit of Mr. Bridgen, so far as the note of $1,000 was concerned.

The mortgage was given nearly a month before the $1,000 note was due, without Stark having asked for such security; it covered the whole of the bankrupt's personal property; it apparently transferred the whole legal title of that property to the mortgagee, leaving only an equitable right of redemption, which right of redemption the creditor could foreclose by a sale after the forfeiture, which took place the day after its execution; it was not given in the ordinary course of business, and was, for that reason, presumed to be fraudulent and void, under the provisions of the 35th section of the bankruptcy act.

The respondent, Stark, is, I think, chargeable with notice of the mortgages to Mrs. Savage, executed at the same time with his own; and these mortgages, taken together, were fraudulent, and an act of bankruptcy on their face. They were, in substance, conveyances of the whole property of the bankrupt, and, if enforced according to their terms, nothing was likely to be left for her unsecured creditors. In respect to the property of an insolvent, it may properly be said—to use the language of Lord Mansfield, in Worseley v. Demattos, 1 Burrows, 467:—"A conveyance of a part may be public, fair and honest, but a conveyance of all must either be fraudulently kept secret, or produce an immediate absolute bankruptcy." This language is strictly applicable to the present case, and the language of the same judge, in Wilson v. Day, 2 Burrows, 827, might, with slight variation, be used in this case. Lord Mansfield there said: "This deed is an act of bankruptcy itself. It defeats the whole bankrupt law: nothing remains for the creditors in any shape, but the whole property is put into the hands of his own trustees; therefore, of course, he is a bankrupt the moment he has executed the deed; for there is nothing at all left for his creditors." See Grow v. Ballard [supra], and authorities there cited.

The utility and the justice, not to say the necessity, of the provision which renders securities, &c., given out of the ordinary course of business, prima facie fraudulent, is well illustrated by the present case. This prima facie evidence is present to every creditor who accepts a security in any case to which the provision is applicable; and, unless the creditor has evidence sufficient to repel this legal presumption, he has reasonable cause to believe that the security is fraudulent and void under the bankruptcy act. This will necessarily prevent any security, voluntarily given by an insolvent to a favored creditor, from being held valid, simply because it proceeded from the voluntary act of the debtor, and was prepared and delivered without any previous communication with the creditor, either in regard to the giving of the security, or the financial condition of the debtor. If a debtor can effectually secure any favored creditor by this one-sided and unusual mode of proceeding, it is likely to be resorted to in every case where the creditor (in consequence of a previous understanding with his debtor, or of the debtor's known disposition to secure him against loss, to the prejudice of his other creditors,) is willing to rely upon the favorable disposition of his debtor, and to be willfully ignorant of his financial condition; and the salutary provisions of the bankruptcy act, which were intended to invalidate the unjust preferences, and to prevent all the other frauds growing out of the validity of general or partial assignments, for the benefit of particular creditors, would be evaded and defeated with ease and certainty. This case shows the propriety of the provision, and it is the manifest duty of this court to give to it the effect which it was the intention of congress should be given to it.

A creditor cannot, by shuttting his eyes when this statutory prima facie evidence of fraud is placed before him, escape the consequences of this provision. When he accepts a security, he is conclusively presumed to know what appears upon its face, and to have reasonable cause to believe it was intended to accomplish what must be its ordinary and necessary effect; and no "masterly inactivity," no self-imposed ignorance of what the circumstances call upon him to ascertain, however intense and however closely guarded and carefullly cherished that ignorance may be, can make fraudulent preferences, like those attempted to be given in this case, valid and binding, as against the assignee of a bankrupt, while the 35th section of the bankruptcy act remains in force.

Independent of the provisions of that section, the circumstances of the case were sufficient to put Stark upon inquiry (In re Hunt [Case No. 6,881]; In re Wright [Id. 18,071]) and such circumstances and such provisions must be held to render his mortgage invalid.

But it was urged that these securities were not void, because the bankrupt, long before the securities were given, and at the time of the loans by Mrs. Savage, and of

Bridgen's endorsement, promised to give security when required, and executed the mortgages, in fulfillment of such promises, under pressure from the mortgagees.

This position cannot be maintained. The provisions of the bankruptcy act embrace payments, for the purpose of giving preference, as well as the giving of securities, &c., and it would hardly be contended that a preference, by way of payment, otherwise invalid, could be valid because the debtor had agreed to pay the debt at the time it was contracted. Besides, the maintenance of the doctrine contended for would defeat the purposes of the bankrupt act. It would be easy, in every case where it was desired to give a fraudulent preference to a relative, or other favored creditor, to make such a contract for security, when called for; and such agreements would be, in effect, secret liens upon the property of the debtor, and enable him to effect the objects generally effected before the bankruptcy act, under promises to secure relatives and endorsers against loss in any event, by assignments made for the benefit of such favorite creditors. A preference gained by a creditor, through the acts and co-operation of his debtor, is no less fraudulent and invalid because it was strongly urged upon his debtor. See Atkinson v. Farmers' Bank, [Case No. 609]; Shawhan v. Wherritt, 7 How. [48 U. S.] 641.

In addition to the objections to these chattel mortgages, which have already been stated, it was insisted that they were fraudulent and void under the laws of this state. There was no immediate or continued change, or, indeed, any change, of possession, for some four months after their execution; and the circumstances of the case tend rather to support than to repel the legal presumption of fraud afforded by the continued possession of the mortgagor. But the conclusions already reached render it unnecessary to decide whether these mortgages were void under the laws of the state, or whether the assignee in bankruptcy, appointed under proceedings commenced after possession of the mortgaged property was taken by the mortgagees, can avail himself of the fact that there was no such immediate or continued change of possession.

A decree must be entered for the petitioner [unless the matter is otherwise arranged by the parties; and the terms of the decree must be settled on the application of the petitioner, after eight days' notice to the respondents' attorneys of the time and place when and where a draft decree will be presented for settlement; and a copy of the decree proposed must be served with such notice].[2]

GRAHAM (STATE v.). See Case No. 13,323.

[2] [From 3 N. B. R. 357 (Quarto, 93).]